**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIO ALIANO and DUE FRATELLI,** | ) | |
| **INC., individually and on behalf of** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 10148** |
| | ) | |
| **WHISTLEPIG, LLC, and** | ) | **Magistrate Judge Finnegan** |
| **GOAMERICAGO BEVERAGES, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Mario Aliano and Due Fratelli, Inc. (a restaurant operated by Aliano) have filed suit on behalf of themselves and other similarly situated consumers and businesses, charging Defendants WhistlePig, LLC and Goamericago Beverages, LLC, with engaging in fraudulent and deceptive trade practices in connection with the marketing and advertising of WhistlePig Straight Rye Whiskey. Count I, asserted on behalf of Aliano and a subclass of Illinois consumers who purchased WhistlePig (Subclass A), alleges violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2451 *et seq.* Count II, also asserted on behalf of Aliano and Subclass A, alleges violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS § 505/1 *et seq.* Count III, asserted on behalf of Due Fratelli and a subclass of Illinois businesses that purchased WhistlePig (Subclass B), seeks damages and injunctive relief stemming from violation of the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS § 510/1 *et seq.* Count IV states a claim for restitution and unjust enrichment on behalf of Plaintiffs and both Subclasses.

The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Defendants now seek to dismiss the Complaint in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In their opposition brief, Plaintiffs concede that Count I must be dismissed for lack of standing since they are Illinois residents who purchased WhistlePig in Illinois. (Doc. 21, at 3 n.2). *See Sherman v. Ben & Jerry's Franchising, Inc.*, No. 1:08-cv-207, 2009 WL 2462539, at *9 (D. Vt. Aug. 10, 2009) (citizens of Virginia who owned and operated a Virginia franchise were not Vermont consumers capable of bringing a suit under the Vermont Consumer Fraud Act). Count I is therefore dismissed. As for the ICFA and IDTPA claims in Counts II and III, Defendants argue that they must be dismissed because Plaintiffs do not allege that they have suffered actual or future damage, and fail to plead fraud with the requisite particularity. Defendants also argue that allegations of fraud based on deceptive statements appearing on the WhistlePig label affixed to the bottles are barred because federal regulators pre-approved the label. For the reasons set forth here, the motion is granted in part and denied in part.

## BACKGROUND

In reviewing this motion, the Court accepts the Complaint's factual allegations as true and draws all reasonable inferences in Plaintiffs' favor. *Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). Defendants WhistlePig and Goamericago Beverages are Delaware corporations with principal places of business in Shoreham, Vermont. In 2010, they launched the WhistlePig brand of rye whiskey, which they market as an artisanal, craft whiskey produced on a small farm in Vermont from certified organic rye grown on site. (Cmplt. ¶¶ 2, 3, 16, 17, 20, 21). In order to "give th[is]

2

illusion of a small farm-based operation," the WhistlePig website describes the production process as including farm fields growing rye, the "bottling room where the bottles are labeled and filled by hand" in an old cow milking parlor, and "barns, which once housed over 200 cows," that "now serve as warehouse space for aging the whiskey." (*Id.* ¶ 24). The website also characterizes WhistlePig as "the nation's first 'farm-to-bottle' single-estate distillery," (*id.* ¶¶ 6, 26), and credits Dave Pickerell as its "Master Distiller" whose only goal is to "create the finest rye whiskey." (*Id.* ¶¶ 5, 26). The whiskey bottles themselves display labels prominently representing that WhistlePig is "HAND BOTTLED AT WHISTLEPIG FARM, SHOREHAM, VERMONT." (*Id.* ¶¶ 4, 25).

In reality, "neither WhistlePig, nor the ingredients used in making WhistlePig, are from the Vermont farm." Instead, WhistlePig is distilled and aged by Alberta Distillers, Ltd. ("ADL"), a "massive" factory in Alberta, Canada that "produces and distills industrial-sized quantities of beverage-grade alcohol, including whiskey from numerous other brands." (*Id.* ¶ 9). The purpose behind the small farm marketing strategy is to make "businesses and consumers . . . believe that they are buying unique, premium whiskey, not sourced whiskey from a bulk producer," so that Defendants can charge premium prices. (*Id.* ¶¶ 7, 27).

Plaintiff Aliano is a citizen of the State of Illinois and the owner and President of Plaintiff Due Fratelli, an Illinois restaurant. (*Id.* ¶¶ 14, 15, 34). On an unspecified date in October 2014, Aliano purchased two bottles of WhistlePig, one to serve at the restaurant and one for his personal use. (*Id.* ¶ 36). His purchase decision was based on research he conducted into the details of various brands of whiskey, including

WhistlePig, along with a comparison of the representations that each brand made in their "marketing and advertising materials." (*Id.* ¶ 35). Aliano did not know prior to the purchase that WhistlePig is made from mass produced whiskey distilled and aged in Canada. Had he known this fact, he would not have bought the product. (*Id.* ¶¶ 37, 38).

On November 18, 2014, Plaintiffs filed a class action suit against Defendants in the Circuit Court of Cook County, Illinois, alleging that they and other consumers and businesses have purchased "hundreds of thousands of bottles of WhistlePig at a premium price" without knowing that it "is not made on a humble farm from locally grown rye" but is "made with the same 100% rye recipe that other ADL rye whiskeys are made with." (*Id.* ¶¶ 8, 10). Those other ADL-manufactured whiskeys, moreover, are sold under different brand names by different companies for much lower prices than WhistlePig. (*Id.* ¶ 30). Plaintiffs claim that Defendants have deliberately engaged in deceptive marketing and advertising strategies because they "know that consumers and businesses are willing to pay more for a craft, Vermont rye whiskey because the quality would be higher, and Defendants know that Plaintiffs and other consumers and businesses believe they are paying costs associated with higher-quality ingredients and for small-scale production." (*Id.* ¶¶ 32, 33).

Defendants removed the case to federal court based on diversity jurisdiction, and now seek to dismiss the entire complaint for failure to state a claim.

**DISCUSSION**

**A.    Standard of Review**

In evaluating the sufficiency of a complaint under Rule 12(b)(6), the Court must "construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmoving party's] favor."  *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010).  "To survive a motion to dismiss, the plaintiff must do more in the complaint than simply recite elements of a claim; the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Zellner v. Herrick*, 639 F.3d 371, 378 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  *See also Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010).  Although a "formulaic recitation of the elements of a cause of action will not do," *id.* at 678, a plaintiff need provide "only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief."  *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008)).

**B.    Analysis**

**1.    Damages Under the ICFA (Count II)**

The ICFA is "a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17, 775 N.E.2d 951, 960 (2002).  To state a claim under the Act, a plaintiff must allege (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception.  *DeBouse v. Bayer*, 235 Ill. 2d 544, 550, 922 N.E.2d 309, 313 (2009).  The fifth element requires the plaintiff to allege and prove that the deceptive act proximately caused any damages, meaning he was "'in some manner, deceived' by the misrepresentation."  *Id.*; *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 200, 835 N.E.2d 801, 861 (2005) (quoting *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 155, 776 N.E.2d 151, 164 (2002)).

Defendants insist that Plaintiffs "do not plausibly allege that they were actually deceived by WhistlePig's statements and omissions, as required to state a claim for damages based on deceptive marketing" under the ICFA.  (Doc. 16, at 6).  This argument is premised on the fact that Plaintiffs have filed similar lawsuits against other distilleries challenging the exact same marketing practices.  For example, on September 26, 2014 (before Aliano bought any WhistlePig on an unidentified date in October 2014), he filed suit against the makers of Templeton Rye whiskey alleging that the company deceptively marketed its product as an Iowa rye whiskey when in fact it "is

distilled and aged by MGP Ingredients, Inc.'s factory in Lawrenceburg, Indiana." (Doc. 16, at 7; Doc. 16-2, *Aliano v. Templeton Rye Spirits, LLC*, No. 2014 CH 15667). Aliano subsequently filed three additional lawsuits with similar allegations against other manufacturers, one on October 7, 2014 and two on October 28, 2014. (Doc. 16-3, *Aliano v. Fifth Dimension, Inc.*, No. 2014 CH 16201 (Oct. 7, 2014) (Tito's Handmade Vodka); Doc. 16-4, *Aliano v. Louisville Distilling Co.*, No. 2014 CH 17428 (Oct. 28, 2014) (Angel's Envy Rye whiskey); Doc. 16-5, *Aliano v. Proximo Spirits, Inc.*, No. 2014 CH 17429 (Oct. 28, 2014) (Tincup American Whiskey)).[1]

Defendants contend that in light of these lawsuits, it is not plausible that Aliano purchased WhistlePig in October 2014 "'based on the research he conducted and the false and misleading representations' allegedly made by Defendants." (Doc. 16, at 7). Rather, Defendants find it "evident that this was a strategic purchase so [Aliano] could gin up a lawsuit." (*Id.*). As a result, Defendants argue that the allegations regarding damage are not well-pleaded and Count II must be dismissed. (*Id.*) (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011)) (confirming that allegations must be "plausible" to survive dismissal).

At this stage of the proceedings, where all reasonable inferences must be drawn in Plaintiffs' favor, the Court is satisfied that the allegations of actual deception suffice to defeat Defendants' motion to dismiss. Plaintiffs assert that "[p]rior to purchasing WhistlePig in October 2014, Aliano consulted internet websites and product labels for

---

[1]     Though none of these lawsuits is part of the Complaint, the Court may take judicial notice of the fact that they were filed in Illinois state court. *See Global Relief v. New York Times Co.*, No. 01 C 8821, 2002 WL 31045394, at *4-5 and n.3 (N.D. Ill. Sept. 11, 2002) (for purposes of motion to dismiss libel and commercial disparagement suit, court took judicial notice that the plaintiff had filed a separate complaint against the government for the raiding of the plaintiff's offices and the freezing of its assets).

various brands of whiskey, including WhistlePig, and compared the representations in the marketing and advertising materials for each brand of rye whiskey." (Cmplt. ¶ 35). Based on his research, which did not disclose the fact that WhistlePig is distilled and aged in Canada as opposed to on a small farm in Vermont, Aliano purchased WhistlePig for himself and the restaurant at a premium price, something he would not have done "[h]ad [he] known the truth." (*Id.* ¶¶ 36-38). This is more than adequate to plead the elements of damage and proximate causation. *See Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 628, 888 N.E.2d 1190, 1197-98 (1st Dist. 2008)) ("[A]ctual loss may occur if the seller's deception deprives the plaintiff of 'the benefit of her bargain' by causing her to pay 'more than the actual value of the [product].'"); *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 991 (N.D. Ill. 2013) (citing *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 503-04, 675 N.E.2d 584, 594-95 (1996)) ("[I]t suffices at the pleading stage to allege that the plaintiff incurred a financial injury upon purchasing a product based on the defendant's deceptive statements.").

To be sure, Aliano was already aware at the time he bought WhistlePig in October 2014 that some manufacturers were characterizing their mass-produced alcohol as being craft products produced in small batches. Aliano had filed a lawsuit against Templeton Rye in September 2014 challenging that exact practice, and he was about to file a second lawsuit against the maker of Tito's Handmade Vodka on October 7, 2014.[2] In addition, there were materials available on the internet prior to the

---

[2]    Plaintiffs do not articulate the exact date of the WhistlePig purchase but insist that they had only filed "*one* case" at the time. (Doc. 21, at 6) (emphasis in original). If this is accurate, Plaintiffs must have bought WhistlePig during the first week of October, and likely were already in the process of preparing the October 7 lawsuit against Tito's Handmade Vodka.

purchase disclosing that WhistlePig is made in Canada, two of which Plaintiffs have cited to and relied upon in their Complaint. (*See id.* ¶ 23 n.2, Davin de Kergommeaux, *WhistlePig Farms is Not a Distillery*, Nov. 13, 2013, http://www.canadianwhisky.org/news-views/whistlepig-farms-is-not-a-distillery.html (last visited May 8, 2015) ("WhistlePig is distilled in Canada, from 100% Canadian rye grain, then matured and blended in Canada."); ¶ 10 n.1, Davin de Kergommeaux, *A Revealing Chat With WhistlePig's Raj Bhakta*, WHISKY ADVOCATE, Mar. 19, 2014, http://whiskyadvocate.com/whisky/2014/03/19/a-revealing-chat-with-whistlepigs-raj-bhatka (noting that an article written for the summer 2014 issue of Whisky Advocate "quotes WhistlePig's master distiller, Dave Pickerell, saying that the original WhistlePig came from Canada's Alberta Distillers (ADL), and that some of it still does.")).

Nevertheless, on a motion to dismiss, the Court must assume that Aliano bought WhistlePig in reliance on Defendants' allegedly misleading statements that the product is made on a small farm in Vermont from locally grown rye, that Aliano did not know the truth about the whiskey's origins, and that if he had known, he would not have made the purchase. To the extent that Defendants uncover facts during discovery that they believe disprove these allegations, they may move for summary judgment. But at this juncture, Plaintiff has alleged sufficient facts regarding actual deception to withstand the motion to dismiss the ICFA claim under Rule 12(b)(6).

### 2.    Damages Under the IDTPA (Count III)

While Plaintiff Due Fratelli seeks damages in Count III, "the only remedy under the [IDTPA] is injunctive relief." *Camasta v. Jos. A Bank Clothiers, Inc.*, No. 12 C 7782, 2013 WL 474509, at *5 (N.D. Ill. Feb. 7, 2013) (quoting *Vara v. Polatsek*, 2012 IL App

(1st) 112504-U, at ¶ 82 (Oct. 5, 2012)).  The claim for damages is therefore dismissed.

In order to obtain injunctive relief, a plaintiff must demonstrate that a defendant engaged

in any of the 12 enumerated types of deceptive conduct listed in Section 510/2.  *Popp v.*

*Cash Station, Inc.*, 244 Ill. App. 3d 87, 98, 613 N.E.2d 1150, 1156 (1st Dist. 1992).  In

this case, Plaintiff Due Fratelli alleges that Defendants engaged in the following:

> (2)  cause[d] likelihood of confusion or of misunderstanding as to the
> source, sponsorship, approval, or certification of goods or services;
> . . .
>
> (4)  use[d] deceptive representations or designations of geographic
> origin in connection with goods or services; . . .
>
> (5)  represent[ed] that goods or services have sponsorship, approval,
> characteristics, ingredients, uses, benefits, or quantities that they
> do not have; . . .
>
> (9)  advertise[d] goods or services with intent not to sell them as
> advertised; . . . [and]
>
> (12)  engage[d] in any other conduct which similarly creates a likelihood
> of confusion or misunderstanding.

815 ILCS 510/2.

Defendants argue that Due Fratelli's IDTPA claim fails to allege facts indicating

that the restaurant is "'likely to be damaged' in the future" as required for injunctive relief

under the statute.  *Greenberg v. United Airlines*, 206 Ill. App. 3d 40, 46-47, 563 N.E.2d

1031, 1037 (1st Dist. 1990).  Lack of future damages is a problem in "most" IDTPA

consumer actions because once a plaintiff is aware of the truth behind the deceptive

marketing, it can simply refrain from purchasing the product.  *Popp*, 244 Ill. App. 3d at

99, 613 N.E.2d at 1157 (since the plaintiff "is now aware" that the defendants' system

provides what she considers to be inadequate security, "[t]here can be no confusion in

the future arising from defendants' alleged non-disclosure in marketing their services.").

In this case, Due Fratelli now knows the true source of WhistlePig whiskey and cannot be misled about it in the event it decides to make future purchases.

The restaurant tries to overcome the future damages hurdle with the following, rather convoluted, allegation:

> Plaintiff was damaged, as if it does not purchase WhistlePig for its restaurant, it will suffer damages in the form of lost business from customers who want to drink WhistlePig. However, if Plaintiff purchases WhistlePig and serves it to customers, Plaintiff will suffer damages in the form of lost business from customers who object to Plaintiff's sale of WhistlePig at a premium price when it is not a premium product. Plaintiff cannot sell WhistlePig at a non-premium price without incurring a loss on the sale.

(Cmplt. ¶ 92). Plaintiff's theory appears to be that even though it now knows WhistlePig is made in Canada, it will suffer damages by *not* purchasing it because some customers will decide to go to other restaurants in search of that brand of whiskey, and other customers who continue to eat there will decline to order any alcohol (*i.e.*, they will drink WhistlePig or nothing at all). (Doc. 21, at 10). At the same time, if Plaintiff *does* purchase WhistlePig, "certain customers will object to Due Fratelli stocking WhistlePig and selling it at a premium price, as it is not a premium product." (*Id.* at 11).

Plaintiff does not cite a single case suggesting that it can obtain injunctive relief under the IDTPA even if it never purchases another bottle of WhistlePig, or purchases a bottle even though it now knows the truth about WhistlePig's origins. Essentially, Plaintiff is seeking redress not for the deception it will suffer in the future by purchasing WhistlePig, but for potential lost business if it does (or does not) buy that particular whiskey despite knowing the truth. As Plaintiff explains, consumer preferences may make some people avoid Due Fratelli entirely if they either cannot buy WhistlePig there

or are offended by the restaurant's decision to continue offering it, and may make other people decide not to drink any alcohol with their meals.

Even construing the facts in Plaintiff's favor, its rank speculation regarding future customer behavior is insufficient to state a facially plausible claim for relief under the IDTPA. Plaintiff does not claim that the decision to purchase WhistlePig in October 2014 was in any way tied to customer requests for the product, or that any customers have stated that they will no longer dine or drink alcohol at the restaurant if they cannot buy WhistlePig. Nor does the Complaint say anything about the number of glasses of WhistlePig Plaintiff has even sold from the single bottle purchased shortly before the lawsuit was filed (now seven months ago). As a result, Plaintiff has put forth no plausible allegations that it will suffer future harm in the event it never buys another bottle of WhistlePig. Count III of the Complaint is therefore dismissed without prejudice.

### 3. Particularity of the Fraud Allegations (Counts II and III)

Defendants also object that Plaintiffs have not pleaded their fraud allegations in Counts II and III with the specificity required by Federal Rule of Civil Procedure 9(b). Rule 9(b) mandates that a plaintiff "state with particularity the circumstances constituting fraud or mistake." This includes "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). As the Seventh Circuit has "often incanted," a plaintiff "ordinarily must describe the 'who, what, when, where, and how' of the fraud – 'the first paragraph of any newspaper story.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*, 631

F.3d at 441-42 (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)).  At the same time, "the requisite information – what gets included in that first paragraph – may vary on the facts of a given case."  *Id.* at 442.

Plaintiffs allege that in October 2014, Aliano saw Defendants' misrepresentations regarding WhistlePig on the WhistlePig website, on bottle labels, and in "marketing and advertising materials" found on "internet websites."  (Cmplt. ¶¶ 35, 37).  Defendants object that these allegations "fail . . . to identify the specific marketing and advertising statements made by Defendants, the specific persons who made those statements, when they were made, or how."  (Doc. 16, at 11).  The Court finds that Plaintiffs have provided sufficient detail regarding the allegedly misleading statements Aliano saw in October 2014 on the WhistlePig website and on the product's labels.  Among the alleged misrepresentations on the website were statements that it is "the nation's first 'farm-to-bottle' single-estate distillery" and is produced in a "modest farmhouse dedicated to raising pigs and making WhistlePig whiskey."  (*Id.* ¶¶ 2, 6, 26).  Plaintiffs allege that Defendants tried to reinforce the small farm provenance of the whiskey by putting pictures on the website showing rye fields, and describing barns that "serve as a warehouse space for aging the whiskey" and a "bottling room where the bottles are labeled and filled by hand."  (*Id.* ¶ 29).  Plaintiffs further allege that the website misleadingly credits Dave Pickerell as being Defendants' "Master Distiller" whose only goal is to "create the finest rye whiskey."  (*Id.* ¶¶ 5, 26).  The WhistlePig label, moreover, represents that it is "hand bottled at WhistlePig Farm, Shoreham, Vermont," (*id.* ¶ 4), which Plaintiffs allege is misleading since the whiskey is mass-produced in Canada.

These allegations regarding misrepresentations Aliano read on the WhistlePig website and on the bottle's label are sufficiently specific to satisfy Rule 9(b)'s heightened pleading requirement. *Prescott v. Argen Corp.*, No. 13 C 6147, 2015 WL 94168, at *4 (N.D. Ill. Jan. 6, 2015) (suggesting that allegations met heightened pleading requirements of Rule 9(b) where they provided "the specific source of the misrepresentation at issue (the Captek website)" and gave "a timeframe in which [the plaintiff] relied on the misrepresentation ('mid-2008').").  Under these circumstances, where the misrepresentations were made on Defendants' own website and product, it is not necessary for Plaintiffs to identify a specific person who allegedly made the statements. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*, 631 F.3d at 442 (noting the "twin demands of detail and *flexibility*" in pleading fraud claims) (emphasis added).

At the same time, Plaintiffs have not provided the necessary particularity for their allegations that Aliano was misled by other unidentified "internet websites" and "marketing and advertising materials."  (Cmplt. ¶¶ 35-37.)  For example, they allege: "Defendants' marketing and advertising of WhistlePig portrays WhistlePig as a craft whiskey produced on a small farm in Vermont" (*id.* ¶ 2); "The WhistlePig farm is also credited with growing certified organic rye grain to be distilled into WhistlePig" (*id.* ¶ 3); WhistlePig is "marketed as being a unique Vermont product" (*id.* ¶ 28); Aliano purchased WhistlePig based on "false and misleading representations made by Defendants" uncovered during his research (*id.* ¶ 36); and "None of the marketing or advertising materials that Aliano saw prior to purchasing WhistlePig disclosed that WhistlePig is distilled and aged in Canada, that it is mass produced by ADL, or that it is

not made on a small farm in Vermont." (*Id.* ¶ 37). Plaintiffs must provide more particularity regarding these alleged misrepresentations. Specifically, they should articulate which internet sites Aliano consulted; what other marketing and advertising materials he reviewed; and the specific misleading statements he saw on those sites and in those materials.

Defendants also point to the allegation that "[a]t WhistlePig sponsored events, Defendants, their representatives, and their agents represent WhistlePig as being from Vermont and being from locally grown rye." (*Id.* ¶ 23). Defendants argue that Plaintiffs have not identified "which representatives or agents made those statements, when, or even if such statements were made to the Plaintiffs themselves." (Doc. 22, at 9). Here the Complaint does not allege that Aliano personally attended such events and heard these misrepresentations. Instead the Complaint bases the allegation on an article written by Davin de Kergommeaux. (*WhistlePig Farms is Not a Distillery*, http://www.canadianwhisky.org/news-views/whistlepig-farms-is-not-a-distillery.html (last visited May 8, 2015)). In that November 13, 2013 article, the author attributed the statement about WhistlePig being from Vermont and locally grown rye to an unidentified "young man" distributing WhistlePig at an unidentified Whisky Live event. (*Id.*). The Court agrees that Rule 9(b) requires more particularity for purposes of alleging that Defendants' representatives and agents made misrepresentations about WhistlePig's origins.[3]

Plaintiffs will be permitted an opportunity to amend the Complaint to provide additional details concerning the misrepresentations not directly attributed to the

---

[3]     Interestingly, the two articles by de Kergommeaux that Plaintiffs attach to their Complaint as evidence of Defendants' misrepresentations both explicitly state that WhistlePig is distilled in Canada.

WhistlePig website and label.  If they are unable to do so, these allegations will be stricken.

Defendants' final argument, while couched as a particularity objection, is more properly viewed as a defense that many of the alleged statements about WhistlePig are actually true and therefore cannot be false or deceptive.  One such allegedly true statement is that "rye is [in fact] being grown at WhistlePig Farms for use in (future) WhistlePig whiskey."  (Doc. 16, at 12).  Of course, the insertion of the parenthetical "future" is telling here, as Plaintiffs allege that the WhistlePig website made it seem as if the rye was used to make *existing* batches of whiskey.  The allegation that Dave Pickerell is a "Master Distiller" also may be factually true, but Plaintiffs contend that the reference to his goal of creating the finest rye whiskey is part of Defendants' effort to mislead consumers into thinking they are purchasing a small craft whiskey.  Plaintiffs make similar arguments as to the use of the phrase "hand bottled at . . . Vermont" on WhistlePig labels.  Though Plaintiffs concede the bottles are *filled* in Vermont, (Cmplt. ¶ 29), that does not mean they concede the bottles are filled *by hand*.  Given the parties' disagreement about whether the alleged statements are misleading when considered in context, the Court finds that the purported truth of Plaintiffs' allegations is not a basis for granting a motion to dismiss Counts II and III.

### 4.     Regulatory Approval of the WhistlePig Label (Counts II and III)

As noted, Plaintiffs claim that there is one statement on the WhistlePig label that is misleading:  "HAND BOTTLED AT WHISTLEPIG FARM, SHOREHAM, VERMONT." (Cmplt. ¶¶ 4, 25).  Defendants argue that Plaintiffs cannot recover for fraud that is based on this allegedly false statement because the Alcohol and Tobacco Tax and

Trade Bureau ("TTB"), the federal agency responsible for enforcing labeling requirements for alcoholic beverages, pre-approved the WhistlePig label and issued a corresponding Certificate of Label Approval. (Doc. 16-7). Both the ICFA and the IDTPA contain "safe harbor" provisions protecting statements that have been authorized by government regulators. *See* 815 ILCS 505/10b(1) (the ICFA excludes from liability "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."); 815 ILCS 510/4 (the IDTPA does not apply to "conduct in compliance with the orders or rules of or a statute administered by a Federal, state or local governmental agency."). Defendants claim that TTB approval suffices to trigger these safe harbor provisions and insulate them from statutory liability.

Neither party cites to any Illinois case addressing this precise question, but in *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 848 N.E.2d 1 (2005), the Illinois Supreme Court considered whether a tobacco company could be held liable under the ICFA for using the terms "lights" and "lowered tar and nicotine" on its cigarette packaging despite having received Federal Trade Commission ("FTC") approval to use those terms. *Id.* at 244, 848 N.E.2d at 38. The court first analyzed the safe harbor language itself, holding that the phrase "specifically authorized" describes "the substance or content of the authorization," indicating "a legislative intent to require a certain degree of specificity or particularity in the authorization." *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 243-44, 848 N.E.2d 1, 38 (2005).

The court also found "particularly helpful" a Seventh Circuit analysis of the safe harbor provision as set forth in *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir.

2001), a case involving statements about medications that had been authorized by a rule formally adopted by the Food and Drug Administration ("FDA"). Specifically, the Supreme Court agreed with the Seventh Circuit's conclusion that the phrase "specifically authorized by laws administered by" encompasses "the making of statements that 'fall within the boundaries established by federal law' (*Bober*, 246 F.3d at 943) *in a highly regulated industry*, even if those statements may tend to be confusing or misleading." 219 Ill. 2d at 261-62, 848 N.E.2d at 48 (emphasis added). In *Bober*, for example, the defendant's statements regarding over-the-counter and prescription versions of its drug were entitled to protection under the ICFA because they complied with the "[t]echnical requirements" of the "highly regulated" pharmaceutical industry. 246 F.3d at 942-43.

After devoting more than 20 pages to the history of tobacco regulation, including a discussion of product investigations, recommendations to Congress, reexaminations of the methods used for cigarette testing, the convening of a "consensus conference" on "low tar" and "light" tobacco products, and agency solicitation of public comment, the Illinois Supreme Court found that the safe harbor likewise applied to the defendant's tobacco labels. 219 Ill. 2d at 185-208, 848 N.E.2d at 6-19. Since the FTC "specifically authorize[d] all United States tobacco companies to utilize the words 'low,' 'lower,' 'reduced' or like qualifying terms, such as 'light,' so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content," the defendant could not be liable under the ICFA for using those terms with the appropriate disclosures. *Id.* at 265-66, 848 N.E.2d at 50 (citing *In the Matter of American Brands, Inc.*, Consent Order, 79 F.T.C. 255 (Aug. 20, 1971); *In the Matter of*

*the American Tobacco Co.*, Consent Order, 119 F.T.C. 3 (Jan. 3, 1995)).  *See also*

*Mario's Butcher Shop and Food Ctr., Inc. v. Armour and Co.*, 574 F. Supp. 653, (N.D. Ill.

1983) (dismissing consumer fraud claim challenging the stated weight of packaged

meat that complied with established federal "regulations for the inspection of meat

processing establishments.").

Applying these principles to the TTB's label approval process, the Court is not

convinced that provision of a Certificate of Label Approval constitutes sufficient

government authorization to invoke the statutory safe harbor provisions.   Plaintiffs

challenge the accuracy of the statement on the WhistlePig label that it is "hand bottled

at WhistlePig Farm, Shoreham, Vermont."   Unlike in *Price*, where the use of the

disputed terms was expressly reviewed and approved, there is no evidence that the

TTB affirmatively investigated or confirmed the validity of the "hand bottled"

representation, or that it even has established criteria for evaluating the use of that term.

Nor is it clear that the TTB label approval process is akin to those in the highly regulated

tobacco, food and drug industries.

A California district court recently considered this exact issue in *Hofmann v. Fifth

Generation, Inc.*, No. 14-CV-2569, Slip. Op., Doc. 15 (S.D. Cal. Mar. 18, 2015), where

the defendant argued that the plaintiff's consumer fraud claims based on the labeling of

"Tito's Handmade Vodka" were barred by the safe harbor provisions in California's

consumer protection laws.   The plaintiff alleged that the label was false because the

vodka is actually made by means of a "highly mechanized process that is devoid of

human hands," *id.* at 1, but the defendant stressed that the TTB had approved the Tito's

labels.  *Id.* at 10.

The court declined to find that TTB approval sufficed to trigger the safe harbor provisions, noting that the defendant had not cited "any authority to show that the safe harbor extends to informal agency action of the type at issue here." *Id.* at 12. Nor did the defendant provide any meaningful response to the plaintiff's observations that "no regulation actually authorizes the use of 'Handmade' on the Tito's label; [and that] unlike the rigorous FDA approval process for prescription-drug labels (which can create a safe harbor), the TTB approval process hinges on self reporting and reflects only that [the defendant] represented to the TTB that Tito's is handmade." *Id.* at 11. Absent any guidance from the TTB regarding the meaning of the word "Handmade," moreover, the court was not convinced that the agency necessarily had the authority to evaluate that term in any event. *Id.* at 12.

*Marty v. Anheuser-Busch Cos.*, 43 F. Supp. 3d 1333 (S.D. Fla. 2014), relied on by Defendants, is not to the contrary. There the court found that statutory safe harbor provisions did not apply to TTB-approved portions of allegedly misleading beer labels that were not visible to consumers prior to purchase, or to non-TTB-approved markings found on cartons and other marketing materials as opposed to bottle labels. *Id.* at 1343-44. The court did not have occasion to address whether TTB approval would otherwise satisfy the authorization requirements for safe harbor purposes.

On the record presented, the TTB's approval does not rise to the level of government authorization sufficient to invoke the safe harbor provisions of the ICFA and IDTPA. Defendants' motion to dismiss allegations of fraud that are based on statements found on the WhiskeyPig label is therefore denied.

### 5.     Unjust Enrichment

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, at ¶ 25 (2012). Unjust enrichment is not an independent cause of action but, rather, "is [a] condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud." *Id.*

In light of the Court's determination that Plaintiffs have adequately pled an ICFA claim, the related unjust enrichment claims are likewise sufficient to withstand Defendants' motion to dismiss. *See Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 775 (S.D. Ill. 2010) (quoting *Association Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007)) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.").

### CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) (Doc. 15) is granted in part and denied in part. Counts II and IV may stand, but only to the extent the alleged fraud is based on statements made on Defendants' website and product labels. Counts I and III are dismissed. Plaintiffs have until June 1, 2015 to file an amended complaint consistent with this opinion.

ENTER:

Dated: May 18, 2015

_____
SHEILA FINNEGAN
United States Magistrate Judge